UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FILED

JUL 1 1 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| STEVEN RODRIGUEZ, | § | |
| a/k/a JOSE REYNOSA, | § | |
| TDCJ No. 999028, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL NO. SA-05-CA-659-RF |
| | § | |
| NATHANIEL A. QUARTERMAN, | § | |
| Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner Steven Rodriguez, also known as Jose Reynosa, filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his April, 1992, Bexar County capital murder conviction and sentence of death. For the reasons set forth below, petitioner is not entitled to any federal habeas corpus relief from his conviction but is entitled to federal habeas corpus relief mandating petitioner receive a new capital sentencing hearing conducted in conformity with clearly established federal constitutional principles.

## I. Statement of the Case

A. The Crime and Its Immediate Aftermath

During the early morning hours of July 4, 1990, petitioner entered the residence of 79-year-old Agnes Herden through a window, fatally stabbed her with a hunting knife petitioner had brought with

him, and removed a number of items of Mrs. Herden's property from her home.[1]  Shortly thereafter, petitioner was observed carrying a television set and other items of Mrs. Herden's property toward the home of his sister, a short distance from the crime scene.[2]  When he

[1] Petitioner's written statement detailing his burglary of Mrs. Herden's residence and his fatal stabbing of Mrs. Herden was not admitted into evidence during petitioner's trial but was admitted into evidence during petitioner's first state habeas corpus proceeding.  For unknown reasons, respondent failed to furnish this Court with a copy of the exhibits admitted into evidence during petitioner's initial state habeas corpus proceeding.  Fortunately, a substantial portion of petitioner's post-arrest written statement was quoted at length by the state habeas court in its findings of fact and conclusions of law in petitioner's first state habeas corpus proceeding. Transcript First State Habeas Proceeding, App. No. 44,330-01, Volume II of II, at pp. 180-82.

The autopsy performed on Mrs. Herden revealed she sustained (1) multiple bruises and superficial tears to the skin of her right forearm, (2) a pair of fresh bruises to her right knee, (3) bruises to her front left shoulder and right breast, (4) a bruise to her left jaw, (5) a total of six knife wounds to her face, neck, and upper chest, (6) a neck wound which penetrated into and all but completely severed her right common carotid artery, (7) an irregular, front-to-back stab wound which penetrated her left upper chest, between her second a third ribs, through her left lung, and between her third and fourth ribs at the back, and (8) another stab wound to her left chest which penetrated the chest wall and went between her third and fourth ribs, through the left lung and struck the back of her chest cavity at the seventh rib. Statement of Facts from Petitioner's Trial (henceforth "S.F. Trial"), Volume 21, testimony of Vincent DiMaio, at pp. 485-98.  The medical examiner concluded Mrs. Herden died as a result of the blood loss caused by the three stab wounds described in detail above, any one of which would have proven fatal by itself. Id., at pp. 487-88.

[2] At approximately 4:30 a.m. on July 4, 1990, one resident of a home only a few blocks from Mrs. Herden's residence was awakened by barking dogs and observed a man he identified at trial as petitioner carrying a television set across and intersection away from the direction of Mrs. Herden's residence. 20 S.F. Trial, testimony of Martin Louis Salazar, at pp. 173-87.  The mother of the first witness testified at trial that she observed "a Mexican

arrived at his sister's residence, petitioner informed those present

he had stabbed "a black guy" at a nearby apartment complex and

feared he was being pursued, possibly by police dogs.[3]  Petitioner

directed one of those present to wash off his bloody knife.[4]

Petitioner removed his blood-stained tee shirt and pants, washed

them in alcohol, and changed into other clothing.[5]  Petitioner hid

a handgun and several items of jewelry he had taken from Mrs.

Herden's residence under the mattress of a bed in his sister's

residence.[6]  When police arrived at petitioner's sister's residence

---

guy" with short black hair carrying a television set and cassette
radio down the street in front of her home at the same time as the
first witness. 20 S.F. Trial, testimony of Elizabeth Theresa
Salazar, at pp. 195-203.

[3] 21 S.F. Trial, testimony of Oscar Samudio, at pp. 332-43;
testimony of Alfred Frias, at pp. 422-28.

[4] *Id.*, testimony of Oscar Samudio, at pp. 341-42.

[5] *Id.*, testimony of Oscar Samudio, at p. 338; testimony of
Alfred Frias, at pp. 425 & 433-34.

[6] Petitioner's sister testified the morning of Mrs. Herden's
murder, she observed police officers discover a handgun and several
items of jewelry in her daughter's bedroom under a mattress which
she knew did not belong to her daughter. 20 S.F. Trial, testimony
of Consuelo Valdez, at pp. 316-27.
A San Antonio police officer testified regarding the discovery
on the morning of the murder of the handgun and jewelry in question
between a mattress and box springs in the south bedroom of
petitioner's sister's trailer home, along with a black tee shirt
and pair of jeans both damp with alcohol. 21 S.F. Trial, testimony
of Joe De La Luz, at pp. 361-67.
A pair of Mrs. Herden's adult children identified the handgun
and items of jewelry discovered in Consuelo Valdez's home the
morning of the murder as belonging to their late mother. 19 S.F.
Trial, testimony of Herman Joseph Herden, at pp. 133 & 144-48; 20
S.F. Trial, testimony of Martha Herden, at pp. 302 & 307-08.

shortly after the discovery of Mrs. Herden's body, petitioner pretended to be asleep until he was placed under arrest.[7] Thereafter, petitioner gave police a written statement in which he admitted his commission of the burglary and murder.[8]

B.    Indictment

On April 23, 1991, a Bexar County grand jury returned a one-Count indictment in cause no. 91-CR-2045 charging petitioner with having fatally stabbed Mrs. Herden while in the course of committing and attempting to commit the predicate felonies of burglary of a habitation and robbery.[9]

C.    Petitioner's Mental Health Examination

In July, 1991, petitioner's trial counsel filed a notice of intent to raise an insanity defense and motions requesting a court-appointed psychiatric sanity evaluation.[10]  The state trial court granted the motion for psychiatric evaluation.[11]  Thereafter, Dr. John C. Sparks, Director of Bexar County's Medical/Psychiatric Department, filed a report with the trial court in which he

---

[7] 21 S.F. Trial, testimony of Oscar Samudio, at pp. 346-47; testimony of Alfred Frias, at pp. 431-32

[8] See note 1, supra, and Petitioner's First State Habeas Transcript, App. No. 44,330-01, Volume II of II, at pp. 180-82.

[9] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume 1, at p. 231.

[10] Trial Transcript, Volume 2, at pp. 237-40.

[11] Trial Transcript, Volume 2, at pp. 241-43.

4

concluded petitioner (1) was competent to stand trial, (2) suffered from a mental illness (chronic mild dysthymic disorder) which required neither treatment, medication, nor hospitalization, and (3) was *not* mentally retarded within the parameters of applicable state statutes.[12]

D.    Guilt-Innocence Phase of Trial: Petitioner's Guilty Plea

The guilt-innocence phase of petitioner's trial began on April 7, 1992.  On April 8, 1992, after the prosecution had presented seven of its witnesses, petitioner's counsel informed the trial court that petitioner wished to change his plea to guilty.[13] Petitioner then entered a plea of guilty.[14]  After interrogating petitioner extensively on the record to verify the voluntary and knowing nature of petitioner's new plea, the state trial court accepted same.[15]   Thereafter, the prosecution continued with its case in chief, presenting another sixteen witnesses before finally resting on April 10, 1992.  That same date, in accordance with the trial court's instructions, the jury returned a verdict of guilty.[16]

---

[12] Trial Transcript, Volume 2, at pp. 249-53.

[13] 20 S.F. Trial, at pp. 236-56.

[14] 20 S.F. Trial, at pp. 256-58.

[15] 20 S.F. Trial, at pp. 258-67.

[16] 22 S.F. Trial, at pp. 524-30.

E.    Punishment Phase of Trial

During the ensuing, punishment phase of petitioner's trial, the prosecution presented (1) a host of law enforcement and correctional officers who testified regarding numerous instances of criminal conduct by petitioner and (2) several relatives and acquaintances of petitioner who testified to additional instances of misconduct by petitioner.

More specifically, the prosecution presented testimony from several witnesses about an incident on December 21, 1984 in which petitioner (1) burglarized an auto repair shop, causing several thousand dollars of damage to the building and its contents, (2) smashed a pickup truck through an overhead door and gate of the business, (3) led police on a high speed chase through downtown San Antonio traffic during which the stolen pickup truck petitioner was driving side-swiped several other vehicles before finally crashing, (4) fled on foot from the accident scene, and (5) violently resisted arrest when finally chased down and cornered by police, injuring the hand of one arresting officer in the process.[17]

---

[17] The owner of the auto body shop petitioner burglarized testified (1) someone entered his business after breaking a window and tearing the casing loose from his building, (2) the thief or thieves ransacked a pickup truck that was being repaired inside a closed building, (3) the thief or thieves drove another pickup truck, which was missing its rear bumper and license plate, out of the building through an overhead door, destroying the door in the process, (4) the stolen pickup then drove through and broke the chain link fence and locked gate on the edge of the property before ultimately wrecking the truck, and (5) his business sustained $1,875 in damage while the stolen pickup truck sustained $3,412 in

Petitioner was also involved in another auto theft in February, 1986, when he led police on a high speed chase in a mortuary home vehicle which had been stolen only days before from the front of a church while a funeral service was underway; the chase ended only after petitioner drove the stolen vehicle head-on into a telephone pole and again fled the scene on foot.[18]

A parade of current and former correctional officers testified to numerous incidents of misconduct by petitioner while incarcerated, establishing (1) on October 21, 1984, petitioner was

---

damage. 22 S.F. Trial, testimony of Douglas Boazman, at pp. 608-13. A San Antonio police officer testified to the extensive damage to the auto shop he observed and authenticated the many photographs of the damage which he took the night of the burglary. 22 S.F. Trial, testimony of Curtis Saathoff, at pp. 598-606.

A San Antonio police officer testified regarding the details of his high speed pursuit of petitioner in the stolen pickup truck and petitioner's violent resistance to his efforts to arrest petitioner. 22 S.F. Trial, testimony of Preston Dick, at pp. 576-86. Another San Antonio police officer testified he was forced to make the physical arrest himself because the first officer who captured petitioner was too badly injured by petitioner to do so. 22 S.F. Trial, testimony of Rodney Daniels, at pp. 592-96.

[18] A former employee of Sutton & Sutton Mortuary in San Antonio testified a beige and white Cadillac was stolen from the front of St. Paul United Methodist Church during funeral services for an employee of the mortuary company and was recovered several days later after having sustained more than $4,000 in damage. 23 S.F. Trial, testimony of Kenneth Wayne Hardeman, Jr., at pp. 703-07.

A San Antonio police officer testified (1) on February 9, 1986, he observed petitioner driving the stolen mortuary vehicle with four other persons inside the vehicle, (2) the instant he pulled in behind the stolen vehicle, it took evasive action, (3) he was forced to chase the stolen vehicle for several blocks with his lights turned on, (4) the chase ended only when petitioner, who was driving, struck a telephone pole head-on, and (5) petitioner fled the scene on foot but was later apprehended. 23 S.F. Trial, testimony of Clyde Gentle, at pp. 696-701.

cited for running down a hallway while carrying contraband, i.e., the property of another inmate, and refusing to furnish identification[19]; (2) on December 19, 1986, petitioner was cited for fighting another inmate named Vela[20]; (3) on June 26, 1987, petitioner was cited for fighting another inmate named Zamora[21]; (4) on July 14-17, 1987, petitioner was repeatedly cited for refusing to work and falsely claiming to have a medical excuse[22]; (5) on July 23, 1987, petitioner was cited for having a new tattoo and possessing contraband, i.e., an extra pair of shoes and a razor blade[23]; (6) on October 13, 1987, petitioner and another inmate named Silva jointly assaulted a third inmate named Cartengano[24]; (7) on December 21, 1987, petitioner fought with another inmate in a chow line, refused orders to stop fighting, and had to be physically restrained[25]; (8) on October 10, 1988, petitioner refused to obey an order to work[26]; (9) on May 15, 1989, petitioner was cited for

---

[19] 22 S.F. Trial, testimony of Robin Olin, at pp. 644-50.

[20] 22 S.F. Trial, testimony of Herman Marion, at pp. 656-62.

[21] 22 S.F. Trial, testimony of George Glover, at pp. 630-36.

[22] 22 S.F. Trial, testimony of Melvin Carter, at pp. 636-44.

[23] 22 S.F. Trial, testimony of Charles Antoine, Jr., at pp. 618-29; testimony of Burt Waldon, at pp. 651-55.

[24] 23 S.F. Trial, testimony of Frederick Powell, at pp. 690-94.

[25] 23 S.F. Trial, testimony of Floyd Wiggins, at pp. 766-77.

[26] 23 S.F. Trial, testimony of Robert Lummas, at pp. 680-84.

fighting another inmate named Escobedo[27]; (10) on September 5, 1989, petitioner was cited, along with other inmates, for sniffing paint thinner and was treated in the infirmary[28]; (11) on September 11, 1989, petitioner disobeyed an order to leave the day room[29]; (12) on September 17, 1989, petitioner was observed under the influence of inhalants and again treated in the infirmary[30]; and (13) on November 26, 1989, petitioner participated in a riot in which he stabbed another inmate named Cervantes five times, necessitating Cervantes' hospitalization.[31]

Petitioner's 16-year-old niece testified she feared petitioner, a paint sniffer, would kill again and believed petitioner was "crazy in the head."[32]  Petitioner's brother-in-law testified petitioner had a bad temper and a bad reputation in the community for being peaceful and law-abiding.[33]

---

[27] 23 S.F. Trial, testimony of Pedro Gomez, at pp. 674-79.

[28] 23 S.F. Trial, testimony of Isaiah Eugene Dolphus, Jr., at pp. 665-69.

[29] 23 S.F. Trial, testimony of Curtis Buckingham, at pp. 753-58.

[30] 23 S.F. Trial, testimony of Carlos Perez, at pp. 685-89.

[31] 23 S.F. Trial, testimony of J.D. Whitton, at pp. 724-41. The victim of petitioner's nearly fatal stabbing attack testified he feared he would be subjected to retaliation for testifying against petitioner. 24 S.F. Trial, testimony of Michael Cervantes, at pp. 935-37

[32] 23 S.F. Trial, testimony of Marina Valdez, at pp. 759-66.

[33] 23 S.F. Trial, testimony of Oscar Samudio, at pp. 709-11.

A television news photographer testified petitioner cursed and threatened her while she was photographing petitioner outside a police station the night of his arrest.[34]

Another prosecution witness testified regarding an incident on February 18, 1983 during which petitioner and several others armed with chains and sticks approached three teenagers and threatened to assault the teenagers unless they gave the armed gang their bicycles.[35]

The prosecution also presented expert testimony from Dr. Sparks that (1) while petitioner tested in the range that would normally be considered mentally retarded, petitioner was much better able to adapt to his community and function than an retarded person could, (2) petitioner's historically poor performance on tests could be the result of petitioner's lack of effort, low level of literacy, and lack of formal education, (3) petitioner functions above the range considered retarded, (4) petitioner does suffer from mental illness in the form of mild dysthymic disorder, a non-delusional, non-psychotic, form of depression, (5) persons facing a capital murder trial are frequently depressed, (6) petitioner displays an inability to relate to others with serious constriction of affect, i.e., petitioner has difficulty displaying his emotions, (7)

---

[34] 23 S.F. Trial, testimony of Carol Sue Calberg, at pp. 805-12.

[35] 23 S.F. Trial, testimony of Santiago Fernandez, at pp. 716-24.

petitioner is not insane, not schizophrenic, and is competent to stand trial, (8) petitioner's future conduct is likely to resemble his past conduct and is unlikely to change, (9) he was unable to identify any proof of organic brain damage attributable to petitioner's abuse of inhalants, and (10) his findings regarding petitioner's mental condition were consistent with those of the psychologist who examined petitioner several years before.[36]

Finally, the prosecution presented Dr. James O. Sherman, a Bexar County psychologist who examined petitioner in 1982 during a juvenile criminal proceeding, who testified (1) petitioner's verbal IQ score fell within the mentally retarded range but petitioner's performance score was in the borderline range, (2) petitioner's weaknesses in IQ testing focused on verbal areas directly related to petitioner's lack of formal education, i.e., vocabulary and arithmetic skills, and petitioner performed well above the retarded range on tests measuring visual and logical thinking skills, (3) it was obvious to him that petitioner could function much higher than his overall IQ score indicated, (4) he found no signs of organic brain damage during his examination of petitioner, (5) petitioner was over-anxious and his anxiety impacted petitioner's test performance, (6) petitioner suffered from under-socialized, non-aggressive conduct disorder, i.e., petitioner fails to develop a sense of empathy with others and violates the rights of others in

---

[36] 23 S.F. Trial, testimony of John C. Sparks, at pp. 813-76.

non-aggressive ways, (7) petitioner was competent to stand trial, (8) petitioner was impulsive due to low intellectual functioning and an inability to delay the urge to gratify his impulses, (9) petitioner is not mentally retarded, (10) there was an extremely high probability petitioner would continue to commit criminal acts, (11) petitioner quit school in the fifth grade and was reading and performing arithmetic on a third-grade level when tested, and (12) the fact petitioner was not attending school was a large factor in petitioner's intellectual problems, i.e., petitioner's IQ test was significantly affected by petitioner's failure to participate in the school setting.[37]

Petitioner's trial counsel presented one of petitioner's sisters and one of petitioner's brothers, who testified (1) petitioner's name at birth was "Jose Reynosa," (2) their mother died in 1974, when petitioner was young, (3) their father was rarely present, fought with their mother when she was alive, and played no role in rearing the children, (4) petitioner was a troublemaker from an early age, throwing rocks, fighting, drinking alcohol, and sniffing paint, (5) petitioner was often depressed, and (6) as a toddler, petitioner fell from a second-story window and injured his

---

[37] 24 S.F. Trial, testimony of Dr. James O. Sherman, at pp. 881-930.

head.[38]   Nonetheless they both asked the jury to spare petitioner's life.[39]

On April 16, 1992, after deliberating less than fifteen minutes, the jury returned its verdict, finding beyond a reasonable doubt (1) petitioner deliberately caused the death of Agnes Herden and (2) there was a probability petitioner would commit criminal acts of violence that would constitute a continuing threat to society.[40]

F.   Direct Appeal

The Texas Court of Criminal Appeals affirmed petitioner's conviction and sentence on direct appeal on May 17, 1995.[41]   On

---

[38] 24 S.F. Trial, testimony of Maria Reynosa, at pp. 943-50; testimony of Martin Reynosa, at pp. 951-56.

[39] Id., testimony of Maria Reynosa, at p. 950; testimony of Martin Reynosa, at p. 955.
Petitioner's brother admitted under cross-examination that petitioner had once beaten him to the point of unconsciousness. Id., testimony of Martin Reynosa, at pp. 956.

[40] Trial Transcript, Volume 2, at p. 414.
Petitioner's jury retired to deliberate at approximately 11:40 a.m. on April 16, 1992. 25 S.F. Trial, at p. 1020.   The jury returned its verdict at approximately 11:52 that same date. Trial Transcript, Volume 2, at p. 414; 25 S.F. Trial, at pp. 1023-25.

[41] Rodriguez v. State, 899 S.W.2d 658 (Tex. Crim. App. 1995), cert. denied, 516 U.S. 946 (1995).
As points of error on direct appeal, petitioner argued (1) the state trial court violated state and federal constitutional due process and equal protection principles by denying petitioner the type of comprehensive mental health examination mandated by state statute, (2) his trial counsel rendered ineffective assistance by failing to (a) properly investigate and develop evidence for use at the punishment phase of trial, (b) object to error in the exclusion of potential jurors, (c) waiving due process claims, (d) adequately

October 30, 1995, the United States Supreme Court denied petitioner's petition for writ of certiorari.[42]

G.   First State Habeas Corpus Proceeding

Petitioner filed his first state habeas corpus application on October 21, 1996.[43] On December 10, 1997, the trial court held an evidentiary hearing in which the parties presented testimony focusing primarily on the issue of whether petitioner possessed the mental capacity to enter a knowing guilty plea.   During the

---

voir dire the jury venire regarding their views on capital punishment, (e) move to set aside the indictment, and (f) request a jury instruction on voluntary intoxication, (3) the trial court erred in excluding a number of potential jurors because of their personal views on capital punishment, (4) petitioner's indictment was defective under applicable state law, (5) the trial court erred in failing to give, and in denying petitioner's request for, a special issue directing the jury to consider the mitigating evidence and determine whether it justified imposition of a life sentence, and (6) the trial court's jury charge erroneously defined "deliberately."

[42] *Rodriguez v. Texas*, 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995).

[43] Transcript of pleadings, motions, and other documents filed in petitioner's first state habeas corpus action, i.e., App. No. 44,340-01 (henceforth "Transcript: First State Habeas Proceeding"), Volume I of II, at pp. 1-56.
Petitioner's first state habeas corpus application asserted twenty claims for relief, including arguments that (1) the Texas habeas corpus statute violated various provisions of the state and federal Constitutions, (2) the trial court erroneously admitted illegally seized evidence, (3) petitioner was denied his rights to jury trial, confront adverse witnesses, remain free from compelled self-incrimination, present witnesses, and the assistance of counsel, (4) his trial counsel rendered ineffective assistance at both phases of trial, (5) his guilty plea was involuntary and unknowing, and (6) the prosecution's exercise of peremptory challenges violated the rule in *Batson v. Kentucky*.

petitioner's first state habeas hearing, psychiatrist Dr. Michael Arambula testified (1) petitioner's intellectual functioning fell right between mental retardation and borderline intellectual functioning, (2) while petitioner's paint sniffing had aggravated petitioner's cognitive capacity, petitioner demonstrated no "significant impairment" as a result of his inhalant abuse, (3) he did not believe Dr. Sparks had examined a broad enough range of petitioner's performance before concluding petitioner was not mentally retarded, (4) petitioner has a low frustration tolerance, gets upset easily, can't concentrate, is hyperactive, and irritable, (5) petitioner's mental retardation and other problems interfere with his ability to intentionally murder anyone and to know the difference between right and wrong, (6) petitioner lacked sufficient mental capacity to comprehend the significance of his guilty plea, (7) petitioner's depression leads to feelings of hopelessness and impulsive conduct, as exemplified by petitioner's entry of his guilty plea against the advice of his counsel, (8) petitioner's guilty plea resulted from petitioner's depression and cognitive impairment and was entered without full understanding of the consequences of same, (9) petitioner sabotaged his own trial by pleading guilty, (10) petitioner is "on the cusp" of mental

retardation, and (11) based on Dr. Zuelzer's report and the other information available, he believed petitioner was mildly retarded.[44]

Dr. Margaret Zuelzer, a licensed psychologist, testified (1) she performed psychological tests on petitioner, including a Wechsler IQ test for adults on which petitioner scored 68 on the verbal scale, 77 on the performance scale, yielding a full scale score of 71, which is outside the range for mental retardation, (2) petitioner is functionally illiterate, performing at the third grade level in both reading and basic arithmetic skills, (3) petitioner's understanding of societal rules and strictures is limited, (4) petitioner's intellectual functioning is so low he is incapable of learning, (5) petitioner is not capable of acting deliberately, (6) petitioner's intellectual deficiencies and emotional limitations lead to a sense of alienation and impulsiveness, (7) petitioner is incapable of understanding the long-term consequences of his own actions, and (8) medication could improve petitioner's depression and "distractability" but would not affect his IQ.[45]

Dr. Sparks testified at the same hearing (1) his conclusions that petitioner functions in the borderline category and is *not* mentally retarded had not changed and were consistent with Dr.

---

[44] Statement of Facts from State Habeas hearing held December 10, 1997 (henceforth "S.F. First State Habeas Hearing"), testimony of Michael Arambula, at pp. 4-69.

[45] S.F. First State Habeas Hearing, testimony of Margaret Zuelzer, at pp. 71-117.

Arambula's conclusions and the test scores obtained by Dr. Zuelzer, (2) an IQ test score is one of three components which must be examined to make a finding of mental retardation, (3) petitioner's adaptive behavior while in custody was far above the level he would expect of a mentally retarded person, (4) experts could easily disagree over the extent of deficiencies in petitioner's adaptive behavior.[46]

Petitioner's second-chair trial counsel testified at the same hearing that he (1) did not perceive any mental retardation in petitioner, (2) he knew and trusted Dr. Sparks as a man of science, held Dr. Sparks in high regard, and had no reason to doubt Dr. Sparks' findings regarding petitioner's mental health, (3) he was not concerned regarding petitioner's mental capacity at the time of petitioner's guilty plea, (4) the request for a mental health examination of petitioner was part of an initial trial strategy to assert an insanity defense which was undermined by Dr. Sparks' findings, and (5) nothing in petitioner's mental capacity impeded his ability to communicate with petitioner.[47]

---

[46] S.F. First State Habeas Hearing, testimony of Dr. John C. Sparks, at pp. 128-61.

[47] *Id.*, testimony of Vincent D. Callahan, at pp. 196-233.

On December 19, 1999, the state trial court issued its findings of fact, conclusions, of law, and recommendation that petitioner's first state habeas corpus application be denied.[48]

On April 12, 2000, the Texas Court of Criminal Appeals issued an unpublished Order adopting the trial court's findings and conclusions and denying petitioner's initial state habeas corpus application.[49]

H.   First Federal Habeas Corpus Proceeding

Petitioner filed his first federal habeas corpus petition in this Court as cause no. SA-00-CA-443-EP on October 12, 2000.  In an Order issued March 31, 2003, this Court dismissed petitioner's federal habeas corpus petition without prejudice so petitioner could return to state court and exhaust available state remedies on his unexhausted claim that he was mentally retarded and, thereby, exempt from execution under the Supreme Court's then-recent holding in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).[50]

---

[48] Transcript: First State Habeas Proceeding, Volume II of II, at pp. 164-98.

[49] *Ex parte Rodriguez*, App. no. 44,330-01 (Tex. Crim. App. 2000).

[50] *Rodriguez v. Cockrell*, 2003 WL 1906154 (W.D. Tex. March 31, 2003).

I.   Second State Habeas Corpus Proceeding

Petitioner filed his second state habeas corpus application, asserting his *Atkins* claim, on June 19, 2003.[51]  On July 20, 2004, the state trial court held an evidentiary hearing on petitioner's claim that he was mentally retarded and thereby exempt from capital punishment under the Supreme Court's holding in *Atkins*.   During petitioner's second state habeas corpus hearing, Dr. Sherman testified (1) he interviewed a 14-year-old Jose Reynosa and administered a wide range of psychological tests, (2) Jose communicated very poorly, presented as a frightened, somewhat depressed, child with low self-esteem who gave one-word answers most charitably described as "vague" and "inarticulate," (3) Jose scored slightly better on the English version of the Peabody Picture Vocabulary test than on the Spanish version of the same instrument, (4) Jose was rarely able to complete am organized thought and refused to guess when uncertain of an answer, (5) Jose performed at the third grade level in both reading and mathematics, (6) he concluded this individual was functioning in the borderline category and was not mentally retarded, (7) the evaluation of adaptive skills is "somewhat subjective" and was not performed in Jose's case because he concluded Jose was not mentally retarded, and (8) nothing

---

[51] Transcript: Second State Habeas Proceeding, at pp. 1-18.

in the information he has reviewed on this person since his initial evaluation has changed his opinion on that subject.[52]

Dr. Sparks testified for a third time and again insisted his initial conclusion was correct, i.e., that petitioner performed far too well on the performance portion of the IQ test and in adapting to his surroundings in an institutional setting to be mentally retarded.[53]

The State also presented the state habeas trial court with a plethora of documents relating to petitioner's incarceration, including medical, disciplinary, and other records.[54]

Petitioner presented the state habeas trial court with testimony from a Special Education Professor that (1) there was considerable debate in his profession regarding whether it is possible to perform adaptive skills analysis in an institutional setting, (2) the fact a subject has been incarcerated for a long period of time necessarily creates problems in evaluating adaptive skills performance because "you can't use a technically sound instrument in the way that we would want to use it," (3) there are a lot of areas of adaptive skills which simply can't be evaluated in the prison setting, (4) nonetheless, he believed petitioner

---

[52] S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of Dr. James Sherman, at pp. 7-42.

[53] *Id.*, testimony of D. John C. Sparks, at pp. 43-80.

[54] These records are contained in S.F. Second State Habeas Hearing, throughout Volumes 1 through 6.

showed deficiencies in three areas of adaptive skills, specifically *communication* (both receptive and expressive language), *functional academics* (including reading), and social and interpersonal interaction, and (5) he believed these adaptive behavior deficits were significant and sufficient to qualify petitioner as mentally retarded.[55]

Petitioner also presented an affidavit from another Special Education Professor who apparently had never even met petitioner but who nonetheless opined that (1) the conclusions of Dr. Sparks and Dr. Sherman that petitioner displayed borderline intellectual functioning and showed no adaptive skill impairments were contradicted by the clinical data on petitioner; (2) "impairments in adaptive skill areas could not be ruled out without investigating the presence or absence of impairments in adaptive skills through actual observations of the individual's adaptive skill abilities in natural environments or through a systematic investigation by a trained professional of [sic] others who had directly observed adaptive skill abilities in natural environments"; and (3) the clinical data in Dr. Sparks and Dr. Sherman's reports support a finding that petitioner is mentally retarded under the DSM-IV.[56]

---

[55] S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of Dr. Jim Patton, at pp. 81-113.

[56] S.F. Second State Habeas Hearing, Volume 6 of 6, affidavit of Ruth Luckasson, at pp. 899-900.

On March 29, 2005, the state trial court signed without change the State's proposed findings of fact, conclusions of law, and recommendation that state habeas relief be denied.[57] On June 15, 2005, the Texas Court of Criminal Appeals denied petitioner's second state habeas corpus application.[58]

J.    Petitioner's Current Federal Habeas Corpus Proceeding

Petitioner filed his second federal habeas corpus action on July 15, 2005, alleging in his petition (1) he is mentally retarded and, therefore, exempt from the death penalty under the holding in *Atkins*, (2) his trial counsel rendered ineffective assistance by (a) accepting Dr. Sparks' opinion regarding petitioner's borderline intellectual functioning and failing to secure the assistance of an independent mental health expert to evaluate petitioner for mental retardation, (b) failing to adequately investigate petitioner's mental health and background, (c) failing to develop and present evidence showing petitioner was mentally retarded, and (d) relying on the Texas statutory definition of mental retardation rather than

---

[57] S.F. Second State Habeas Hearing, Volume 6 of 6, at pp. 960-72.

The state habeas trial court concluded (1) petitioner had failed to demonstrate by a preponderance of the evidence that he suffered from significant deficits in adaptive skills, (2) there was evidence from lay witnesses establishing petitioner did not have significant adaptive deficiencies, (3) there was evidence petitioner was aggressive and manipulative, and (4) there was evidence petitioner is able to communicate and function in his environment. *Id.*, at 972.

[58] *Ex parte Steve Rodriguez*, 164 S.W.3d 400 (Tex. Crim. App. 2005).

clinical definitions of same, and (3) the jury charge at the punishment phase of petitioner's trial was defective under the Supreme Court's holding in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[59]

On October 3, 2005, respondent filed his original answer, in which he argued (1) the definition of mental retardation employed by Texas courts in the criminal justice content is significantly different from the clinical definitions employed by professional diagnosticians, (2) the state habeas court reasonably applied the Texas statutory definition of mental retardation in concluding petitioner did not meet that standard of low intellectual functioning, (3) petitioner's trial counsel reasonably relied on the contemporaneous opinion of Dr. Sparks and Dr. Sherman's report of several years earlier in concluding not to seek additional mental health expert evaluation or assistance for petitioner, and (4) the petitioner failed to raise his *Penry* claim in his first federal habeas corpus proceeding and is barred by the applicable one-year statute of limitations from presenting this claim in his second federal habeas corpus proceeding.[60]

On November 28, 2005, petitioner filed his response to respondent's answer.[61]

---

[59] Docket entry no. 1.

[60] Docket entry no. 5.

[61] Docket entry no. 8.

23

## II. **AEDPA Standard of Review**

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of

24

materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Wiggins v. Smith*, 539 U.S. at 520-21, 123 S.Ct. at 2535. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively

unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct. at 2535; *see Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848, 1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. A petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. See *Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004)("The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner 'rebuts the presumption of correctness by clear and convincing evidence.'"), *cert. denied*, 543 U.S. 960 (2004); *Pondexter v. Dretke*, 346 F.3d 142, 146 & 149 (5th Cir. 2003)(holding, pursuant to §2254(e)(1), state court findings of fact

are presumed correct and the petitioner has the burden of rebutting that presumption by clear and convincing evidence), *cert. denied*, 541 U.S. 1045 (2004); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003)(holding the same), *cert. denied*, 540 U.S. 1163 (2004); 28 U.S.C. § 2254(e)(1).

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. See *Pondexter v. Dretke*, 346 F.3d at 148 (holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. *Atkins*/Mental Retardation Claim

A.    The Claim

Petitioner argues his consistently low IQ test scores, the opinions of Dr. Arambula and Dr. Zuelzer, and the opinions of the two Special Education Professors which petitioner presented to the state habeas court collectively establish he is "mentally retarded" within the meaning the Supreme Court's holding in *Atkins*.[62]

B.    The Lack of Clearly Established Federal Law

There are several analytical impediments to this Court's application of the AEDPA's standard of review to petitioner's *Atkins* claim.   Chief among them is the fact the Supreme Court's *Atkins* opinion did not specify a *legal* definition of "mental retardation" but, rather, referred to a pair of *clinical* definitions of mental retardation which leave the determination open to some interpretation.

For purposes of this federal habeas corpus proceeding, the issue before this Court is whether the state habeas court's rejection on the merits of these same arguments was either  (1) contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

---

[62] Petitioner's Federal habeas Corpus Petition, filed July 15, 2005, docket entry no. 1 (henceforth "Petition"), at pp. 42-48.

presented in the petitioner's second state habeas corpus proceeding. *Williams v. Taylor*, 529 U.S. at 404-05, 120 S.Ct. at 1519; 28 U.S.C. § 2254(d). Present in the first half of AEDPA analysis is the assumption *clearly established* federal law exists defining the parameters of a federal constitutional right. In the post-*Atkins* realm of mental retardation, the existence of a constitutional right is clear but its parameters are more difficult to discern.

The Supreme Court's Eighth Amendment analysis in *Atkins* focused initially on current trends among state legislatures regarding the imposition of the death sentence on mentally retarded murderers. *See Atkins v. Virginia*, 536 U.S. at 311-17, 122 S.Ct. at 2246-50 (holding that the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society and that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by state legislatures). The Supreme Court then shifted its focus to the dual penological purposes served by the death penalty: retribution and deterrence of capital crimes by prospective offenders. *Id.*, 536 U.S. at 318-21, 122 S.Ct. at 2250-52. With regard to retribution, the Court held an exclusion from the death penalty for mentally retarded capital murderers was warranted by virtue of "the lesser culpability of the mentally retarded offender" when compared to "the culpability of the average murderer." *Id.*, 536, U.S. at 319, 122 S.Ct. at 2251.

The Court next addressed the remaining penological purpose served by capital sentencing:

> With respect to deterrence -- the interest in preventing capital crimes by prospective offenders -- "it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers.  Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally retarded offenders.  The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable--for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses--that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Atkins*, 536 U.S. at 319-20, 122 S.Ct. at 2251 (citations omitted). The Supreme Court ultimately concluded execution of mentally retarded criminals would not measurably advance the deterrent or retributive purposes underlying the death penalty and, therefore, the Eighth Amendment prohibits such punishment. *Id.*, 536 U.S. at 321, 122 S.Ct. at 2252.

However, the Supreme Court declined in *Atkins* to furnish state and lower federal courts with a definitive *legal* definition of "mental retardation" or "mentally retarded," instead offering two *clinical* definitions as possible options:

The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.   It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.   Mental retardation manifests before age 18."

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).   The onset must occur before age 18 years (Criterion C).   Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."[63]

Like most clinical definitions drawn from the medical and biological sciences, the foregoing definitions cited, but not specifically adopted, by the Supreme Court do not transfer easily into the realm of law, where legally valid distinctions and classifications must necessarily be based on more than a subjective choice between the conflicting testimony of differing diagnosticians.[64]   Since *Atkins*, courts have struggled to identify

---

[63] *Atkins v. Virginia*, 536 U.S. at 308 n.3, 122 S.Ct. at 2245 n.3 (citations omitted).

[64] The Supreme Court and Texas Court of Criminal Appeals have each noted the lack of confluence between psychiatric definitions and legal ones. *See Kansas v. Crane*, 534 U.S. 407, 413, 122 S.Ct. 867, 871, 151 L.Ed.2d 856 (2002) ("the science of psychiatry, which

specific, federal constitutional, standards available to satisfy the minimum requirement that convicted capital murderers who claim to be mentally retarded be evaluated in a nonarbitrary manner.

For example, both of the *clinical* definitions referenced by the Supreme Court in *Atkins* in the passage quoted above include the requirement that "mental retardation" manifest itself prior to age eighteen. In view of recent studies suggesting the human brain does not achieve full development until age twenty-five, this cut-off age of 18 for the initial manifestation of "mental retardation" is subject to challenge as arbitrary.[65] Certainly, there is little justification for excluding the benefits of the *Atkins* holding from persons who sustain brain injuries or neurological illnesses *after* their eighteenth birthdays which would otherwise qualify them as "mentally retarded" under the clinical and statutory definitions currently employed in Texas capital sentencing. In either instance, if the "less morally culpable" person thereafter commits capital

---

informs but does not control ultimate legal determinations, is an ever-advancing science, whose distinctions do not seek precisely to mirror those of the law."), *quoted in Ex parte Briseno*, 135 S.W.3d 1, 9 n.30 (Tex. Crim. App. 2004).

[65] A study funded by National Institute of Child Health and development and reported November 29, 2005 in the on-line journal *Human Brain Mapping* concluded anatomically significant changes in human brain structure continue long after age 18. http://www.dartmouth.edu/~news/releases/2006/02/06.html
Other studies have reached similar conclusions. Bruce Bower, *Teen Brains on Trial: The science of neural development tangles with the juvenile death penalty*, http://www.sciencenews.org/articles/20040508/bob9.asp

murder, what rational basis exists for withholding the protection afforded by the ruling in *Atkins* from the former individual?  This is more than a rhetorical question.  It lies at the heart of the conundrum facing state and federal courts in the post-*Atkins* era. From the standpoint of logic, reason would seem to require that the Eighth Amendment must be construed to protect all individuals whose mental deficiencies at the time of their capital offenses rendered them "less morally culpable" within the meaning of *Atkins*, regardless of when that individual first began to manifest their intellectual deficiencies.

The approaches of Dr. Michael Arambula, a practicing psychiatrist who testified during petitioner's first state habeas corpus proceeding, and Dr. Jim Patton, an adjunct Professor of Special Education called by petitioner during his second state habeas corpus proceeding, illustrate the practical difficulties with evaluating an incarcerated adult for "mental retardation" within the context of the age-18 requirement.  Dr. Arambula's testimony (1) focused almost exclusively on petitioner's IQ test results from 1982 and 1991 while all but ignoring Dr. Zuelzer's 1997 report, which concluded petitioner's *full range* IQ test score was *above* the mentally retarded range, (2) reflected absolutely no analysis whatsoever of petitioner's adult prison disciplinary and medical records, (3) was based on interviews with petitioner's close family members who could hardly be expected to furnish dispassionate,

33

*objective*, accounts of petitioner's childhood and youth, and (4) ignored all of the evidence presented by the prosecution during the punishment phase of petitioner's trial, including testimony addressing petitioner's conduct as a young teenager.[66] Dr. Patton testified (1) it was essential to examine *both* intellectual functioning and adaptive behavior to properly diagnose mental retardation, (2) it was difficult to get a historical perspective on whether a person had adaptive skills deficits before age 18, (3) the fact a person has been incarcerated for a long time creates problems in evaluating adaptive behavior deficiencies, (4) there is considerable debate within the professional literature over whether it is even possible to perform an adaptive skills deficit evaluation in a prison setting, (5) he made no effort to interview petitioner's trial counsel or prison personnel possessing personal knowledge of petitioner's behavior, (6) he did not believe petitioner's current medical or prison records were relevant to the determination of petitioner's adaptive skills deficits, nonetheless (7) based on his interviews with petitioner and petitioner's family, whom he admitted were hardly objective witnesses, he believed petitioner had demonstrated significant deficiencies in communication and academic skills prior to age 18.[67]   If the analytical approaches of Dr.

---

[66] S.F. First State Habeas Hearing, testimony of Michael Arambula, at pp. 9, 33, 52, 57, 68-69.

[67] S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of Jim Patton, at pp. 86-87, 90-94, 96-103, 108-13.

Arambula and Dr. Patton are correct, the clinical definitions of mental retardation cited by the Supreme Court in *Atkins* compel diagnosticians to ignore most *currently available* information on whether an adult prisoner is *currently* demonstrating deficits in adaptive skills behavior.  If Dr. Patton's analytical approach is correct, the efficacy of evaluating a long-time prisoner's *current* adaptive skill behavior is dubious, at best.

Dr. Sparks testified during petitioner's second state habeas corpus proceeding that evaluating an individual's adaptive skill deficits is necessarily "a judgment call."[68]  Dr. Sherman testified during the same hearing that adaptive skills evaluation is necessarily "somewhat subjective."[69]   Dr. Patton's approach to evaluating petitioner's adaptive skills deficits illustrates the subjective nature of such an inquiry: Dr. Patton relied exclusively on his interviews with petitioner and petitioner's family (all of whom were well aware a finding of mental retardation would immunize petitioner from execution) and ignored all information available from prison personnel, petitioner's prison records, or petitioner's trial counsel.

The right of mentally retarded, convicted, capital murderers to remain free from the imposition of the death penalty recognized

_____

[68] S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of John C. Sparks, at p. 75; S.F. First State Habeas Hearing, testimony of John C. Sparks, at pp. 135, 157, 160.

[69] *Id.*, testimony of James Sherman, at p. 17.

in *Atkins,* which is at least as fundamental in a constitutional sense as the right of Florida voters to participate in a constitutionally valid election, is currently unprotected by any *objective,* verifiable, standards sufficient to ensure its equal application.   The widely divergent expert opinion testimony presented during petitioner's trial and multiple state habeas corpus proceedings (and the vastly differing analytical approaches offered by differing experts) illustrates the impracticality, if not impossibility, of ensuring uniform application of the current *clinical* definitions of mental retardation.[70] The current unavailability of a Supreme-Court-sanctioned, uniform, *legal* definition of "mental retardation," along with the highly subjective nature of current *clinical* definitions of that term, has created a situation in which the determination of whether a particular

---

[70] In petitioner's case this problem was exacerbated by the fact petitioner's experts, i.e., Dr. Arambula, Dr. Patton, and Special Education Professor Luckasson, all characterized petitioner as mentally retarded under the guidelines set forth in the DSM-IV while the prosecution's experts, Dr. Sparks and Dr. Sherman, consistently referred to the Texas statutory definition relied on by the Texas Court of Criminal Appeals. *See Ex parte Briseno*, 135 S.W.3d 1, 8-9 (Tex. Crim. 2004)(adopting the definitions of "mental retardation" promulgated by the American Association on Medical Retardation and that codified in Section 591.003(13) of the Texas health and safety Code and discussing additional factors which should be considered by a fact finder making such a determination).
   Thus, the dueling diagnosticians who have disagreed in petitioner's case have been talking past each other, i.e., discussing whether they believed petitioner was mentally retarded without first agreeing upon a single definition of that term and, in fact, applying significantly different definitions, with one group employing a definition drawn from the DSM-IV and another, a definition drawn from Texas statutes.

criminal defendant or convicted capital murderer is "mentally retarded" often becomes a battle between dueling diagnosticians.

C.   <u>AEDPA Review</u>

Faced with the lack of any uniform, objective, definition of "mental retardation" and the inability of the Texas Legislature to address the problem by specifically defining "mental retardation" in the context of capital sentencing, Texas courts faced with determining whether a convicted capital murderer is mentally retarded within the meaning of *Atkins* have relied on a combination of a clinical definition of "mental retardation," the statutory definition of that term contained in the Texas Health and Safety Code, as well as some very pragmatic guidelines. More specifically, in *Ex parte Briseno*, 135 S.W.3d 1, 7-8 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals adopted a combination of both a clinical definition[71] and a statutory definition[72] of "mental retardation" for use in capital sentencing but also specifically

[71] The Texas Court of Criminal Appeals' opinion in *Briseno* referenced the American Association on Mental retardation's definition of "mental retardation," which that court described as "a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Ex parte Briseno*, 135 S.W.3d at 7 (footnotes omitted).

[72] The Texas Court of Criminal Appeals also referenced the definition of "mental retardation" contained in section 591.003(13) of the Texas Health and Safety Code, i.e., "'significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period.'" *Ex parte Briseno*, 135 S.W.3d at 7.

directed fact-finders in criminal trials to focus on the following additional, non-clinical, non-statutory, practical considerations:

> Did those who knew the person best during the developmental stage - his family, friends, teachers, employers, authorities - think he was mentally retarded at that time, and if so, act in accordance with that determination?
> Has the person formulated plans and carried them through or is his conduct impulsive?
> Does his conduct show leadership or does it show that he is led around by others?
> Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
> Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
> Can the person hide facts or lie effectively in his own or others' interests?
> Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Ex parte Briseno*, 135 S.W.3d at 8-9.

The Texas Court of Criminal Appeals has likewise emphasized the issue before the fact-finder is whether the defendant is, in fact, mentally retarded and, while expert opinions on whether the defendant meets psychological diagnostic criteria for mental retardation may assist in this determination, the fact-finder ultimately must base the determination on all of the evidence and the credibility of the witnesses. *Ex parte Briseno*, 135 S.W.3d at 9. The Texas Court of Criminal Appeals has consistently applied the foregoing criteria in evaluating whether a criminal defendant convicted of capital murder was "mentally retarded." *See Hall v.*

*State*, 160 S.W.3d 24, 38-40 (Tex. Crim. App. 2004)(recognizing the similarity between a defense of mental retardation and the insanity defense, holding a defendant must bear the burden of proof to prove mental retardation by a preponderance of the evidence, and concluding such a claim may be rebutted by evidence showing the defendant was never diagnosed as mentally retarded while in school and committed a conceptually complex crime), *cert. denied*, ___ U.S. ___, 125 S.Ct. 2962, 162 L.Ed.2d 891 (2005); *Ex parte Modden*, 147 S.W.3d 293, 295-98 (Tex. Crim. App. 2004)(holding school and prison records fully supported the unanimous expert opinions concluding the defendant was mentally retarded and had been since birth). Thus, the Texas courts apparently do not limit the focus on their *Atkins* analysis on the defendant's conduct prior to age 18 but, rather, examine a wide range of practical considerations in determining whether the defendant truly is "mentally retarded" within the meaning of *Atkins*. Having independently reviewed *Atkins* and Fifth Circuit opinions construing *Atkins*, this Court concludes the Texas Court of Criminal Appeals' *Briseno* criteria represent an objectively reasonable application of what is admittedly a far-from-crystal-clear federal constitutional standard.

The state habeas court's conclusion petitioner is *not* mentally retarded was the product of an eminently reasonable application of the foregoing criteria to the evidence presented during petitioner's trial and state habeas corpus proceedings. The prosecution

presented substantial evidence, in the form of both expert opinion
testimony, school records, and prison medical and disciplinary
records, establishing (1) while attending school, petitioner was
never diagnosed as mentally retarded or eligible to receive special
education services[73]; (2) when Dr. Sherman examined petitioner in
1982 while petitioner was still in his early teens, Dr. Sherman
concluded not only that petitioner was not mentally retarded but
also that there was no need to refer petitioner to the Department
of Mental Health/Mental Retardation for evaluation of petitioner's
adaptive skills deficits[74]; (3) shortly after his conviction for

---

[73] Dr. Patton admitted these facts during his testimony at
petitioner's second state habeas corpus proceeding. S.F. Second
State Habeas Hearing, Volume 1 of 6, testimony of Jim Patton, at p.
112.
    During petitioner's brief sojourn through the public schools,
ending in the fifth grade, Texas public school districts had a
pecuniary interest in identifying students who qualified for
special education services or who were mentally retarded:
supplemental funding from state and federal sources. Given this
fact, the failure of any of petitioner's teachers or school
officials to refer petitioner for testing or evaluation to
determine whether petitioner was either mentally retarded or
eligible to receive special education services is highly
significant.

[74] Dr. Sherman made this point clear during his testimony at
petitioner's second state habeas corpus proceeding. S.F. Second
State Habeas Hearing, Volume 1 of 6, testimony of Dr. James
Sherman, at pp. 15-20. Dr. Sherman testified during the same
hearing that (1) petitioner's academic skills deficiencies were
simply a product of the fact petitioner had not attended very much
school and had very little formal academic training in either
reading or arithmetic, (2) petitioner was not motivated to perform
well on the tests Dr. Sherman employed in 1982, (3) the portions of
the tests on which petitioner performed the most poorly were those
which measured training received in the traditional academic
setting, (4) had he believed petitioner to be mentally retarded, he

capital murder, petitioner informed prison officials he had fathered
three children with two different women without marrying either, he
was a member of the Mexican Mafia prison gang, and he had completed
his GED during a previous term of incarceration[75]; (4) prison mental
health records indicate petitioner presented himself during his May,
1992 interview as well-groomed, alert, oriented, pleasant,
cooperative, and functioning in the average intellectual range[76];
(5) prison disciplinary records revealed another inmate named
Strebeck informed prison officials in July, 1989 that petitioner had
raped Strebeck and forced Strebeck to perform oral sodomy on
petitioner and others in an isolated location at the Beto I Unit[77];
(6) Dr. Margaret Zuelzer's psychological testing of petitioner in
1997 included a Wechsler IQ test which produced a full scale score
of 71, which is above the range considered mentally retarded[78]; and
(7) Dr. Sparks testified petitioner communicated too effectively
with jail medical staff and showed too great a facility to interact

---

would have referred petitioner for further evaluation, and (5) even
if petitioner qualified as mentally retarded under the DSM-IV
criteria, he did not believe petitioner qualified as mentally
retarded under applicable Texas statutes. *Id.*, at pp. 15-16, 22-
25, 27-28, 35, 39.

[75] S.F. Second State Habeas Hearing, Volume 2 of 6, at p. 262.

[76] *Id.*

[77] S.F. Second State Habeas Hearing, Volume 3 of 6, at p. 464.

[78] S.F. First State Habeas Hearing, testimony of Margaret
Zuelzer, at p. 103.

socially with others to fall within the statutory definition of mentally retarded.[79]

Significantly, petitioner's second-chair trial counsel testified during petitioner's first state habeas proceeding (1) he did not perceive any mental retardation in petitioner, (2) he never had any difficulty communicating with petitioner, and (3) nothing about petitioner's mental state impeded his ability to communicate with petitioner.[80]

Furthermore, the prosecution's cross-examination of petitioner's experts revealed their conclusions petitioner was mentally retarded were (1) based on the criteria contained in the DSM-IV[81] and information furnished to them by either petitioner or petitioner's relatives[82] and (2) uniformly historical in nature,

---

[79] S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of John C. Sparks, at pp. 49-52, 63-66, 70-71, 74; S.F. First State Habeas Hearing, testimony of John C. Sparks, at pp. 138-39, 143, 146-49, 157-58; 23 S.F. Trial, testimony of John C. Sparks, at pp. 817-20, 871, 876.

[80] S.F. First State Habeas Hearing, testimony of Vincent D. Callahan, at pp. 205-06, 217, 219, 224-26, 230-31.

[81] S.F. First State Habeas Hearing, testimony of Dr. Michael Arambula, at pp. 56-62, 64, 67-69; id., testimony of Dr. Margaret Zuelzer, at p. 113; S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of Dr. Jim Patton, at p. 102; Affidavit of Ruth Luckasson, S.F. Second State Habeas Hearing, Volume 6 of 6, at pp. 899-900.

[82] S.F. First State Habeas hearing, testimony of Dr. Michael Arambula, at pp. 34, 52, 68-69; id., testimony of Margaret Zuelzer, at pp. 72, 90-91; S.F. Second State Habeas Hearing, Volume 1 of 6, testimony of Jim Patton, at pp. 91-92, 96, 108-11.

disregarding virtually all available information regarding petitioner's mental health *after* petitioner reached age 18, including information regarding petitioner's *current* intellectual functioning and adaptive skills behavior.[83]  Dr. Arambula, one of the two mental health professionals who concluded petitioner was mentally retarded, was far from precise in his diagnosis and conclusion, emphasizing during his testimony (1) petitioner fell in the range "right between" mildly mentally retarded and borderline functioning (which he described as very similar) and (2) petitioner was "on the cusp" of mental retardation.[84]   Dr. Arambula also admitted he had not given any consideration to the testimony from the punishment phase of petitioner's trial or other evidence describing petitioner's violent conduct during incarceration.[85]  Dr. Zuelzer, the only other mental health professional who testified she believed petitioner was mentally retarded, admitted (1) her own testing of petitioner yielded an IQ score *above* the mentally retarded range and (2) she had reviewed neither the record from petitioner's trial nor any of Dr. Sparks' reports.[86]   Thus, the

---

[83] *Id.*

[84] S.F. First State Habeas Hearing, testimony of Dr. Michael Arambula, at pp. 8, 10, 27, 33, 38-39, 67-69.

[85] *Id.*, at pp. 52-54.

[86] S.F. First State Habeas Hearing, testimony of Dr. Margaret Zuelzer, at pp. 75-78, 92, 103.

state habeas court could reasonably have discounted the opinions of petitioner's mental health experts.

The mother of two of petitioner's children testified petitioner was not very smart and had a long history of abusing inhalants but admitted, prior to his arrest and conviction for burglary and auto theft, petitioner had worked construction to support her and their children while their family lived with her mother.[87]

Given the absence of a clearly established federal definition of "mental retardation" set forth in the opinions of the Supreme Court, the objective reasonableness of the legal standard for determining mental retardation in the capital sentencing context employed by the Texas courts (i.e., the *Briseno* criteria), and the substantial evidence supporting the state habeas court's conclusion petitioner is not mentally retarded for purposes of the holding in *Atkins* (i.e., the testimony and reports of Dr. Sparks and Dr. Sherman, as well as information regarding petitioner's behavior while incarcerated), this Court concludes the state habeas court's ultimate conclusion rejecting petitioner's *Atkins* claim on the merits was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable

---

[87] S.F. First State Habeas Hearing, testimony of Martha Rodriguez, at pp. 184-95.

44

determination of the facts in light of the evidence presented in the petitioner's state trial and habeas corpus proceedings.

## IV. Ineffective Assistance Claim

A.    The Complaints

Petitioner argues his trial counsel rendered ineffective assistance by (1) accepting the opinions of Dr. Sparks and Dr. Sherman without obtaining a truly independent evaluation of petitioner's mental retardation from a mental health expert retained or appointed specifically to assist the defense, (2) failing to adequately investigate petitioner's background, (3) failing to develop and present evidence of petitioner's mental retardation, and (4) relying on state statutory definitions of mental retardation instead of clinical definitions available at the time of petitioner's trial.[88]

B.    Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made

---

[88] Petition, at pp. 49-66.

errors so serious that counsel was not functioning as
the "counsel" guaranteed the defendant by the Sixth
Amendment.   Second, the defendant must show that the
deficient performance prejudiced the defense.   This
requires showing that counsel's errors were so serious
as to deprive the defendant of a fair trial, a trial
whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that

his counsel's performance was constitutionally deficient, a

convicted defendant must show that counsel's representation "fell

below an objective standard of reasonableness." *Wiggins v. Smith*,

539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003);

*Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146

L.Ed.2d 389 (2000).   In so doing, a convicted defendant must carry

the burden of proof and overcome a strong presumption that the

conduct of his trial counsel falls within a wide range of reasonable

professional assistance. *Strickland v. Washington*, 466 U.S. at 687-

91, 104 S.Ct. at 2064-66.  Courts are extremely deferential in

scrutinizing the performance of counsel and make every effort to

eliminate the distorting effects of hindsight. *See Wiggins v. Smith*,

539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis

under the first prong of *Strickland* is an objective review of the

reasonableness of counsel's performance under prevailing

professional norms which includes a context-dependent consideration

of the challenged conduct as seen from the perspective of said

counsel at the time).   It is strongly presumed counsel rendered

adequate assistance and made all significant decisions in the

46

exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* In evaluating prejudice, a federal habeas court must re-weigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542.

In evaluating petitioner's complaints about the performance of his counsel under the AEDPA, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, ___, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of

*Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

Applying the AEDPA's standard of review, the issue before this Court is whether the Texas Court of Criminal Appeals could *reasonably* have concluded that petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d at 444.  In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*

C.   <u>AEDPA Review</u>

1.   <u>State Court Disposition</u>

Petitioner fully litigated his ineffective assistance complaints during his first state habeas corpus proceeding. Petitioner's second-chair trial counsel testified before the state habeas court, in pertinent part, that (1) he did not perceive any mental retardation in petitioner, whom he believed to be fully competent to stand trial, (2) he never had any difficulty communicating with petitioner, (3) nothing about petitioner's mental state impeded his ability to communicate with petitioner, (4) the initial trial strategy was to plead not guilty and assert an insanity defense, (5) a mental health examination was requested for

48